**Maria and Guadalupe VELAZQUEZ, individually and on behalf of themselves and all others similarly situated, Plaintiff,**

v.

**GMAC MORTGAGE CORPORATION, GMAC Mortgage, LLC, Defendants.**

**Case No. CV 08–05444 DDP (PLAx).**

United States District Court, C.D. California.

Dec. 22, 2008.

ORDER GRANTING IN PART AND
DENYING IN PART MOTION
TO DISMISS

[Motion filed on October 16, 2008]

DEAN D. PREGERSON, District Judge.

This matter comes before the Court on Defendants' Motion to Dismiss. Plaintiffs, who entered into an Option Adjustable Rate Mortgage loan agreement, bring this suit against GMAC Mortgage Corporation and GMAC Mortgage, LLC for violations of law related to disclosures about the loan. Specifically, the Complaint seeks to allege violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and California's Unfair Business Practices Act, as well as fraudulent omission, breach of contract, and tortious breach of the implied covenant of good faith and fair dealing. Defendants move to dismiss the Complaint in its entirety.

After reviewing the materials submitted by the parties and hearing oral argument, the Court grants in part and denies in part the Motion to Dismiss.

## I. BACKGROUND

### A. *The Parties and the Allegations*

On January 4, 2007, Plaintiffs Maria and Guadalupe Velazquez ("Plaintiffs") refinanced their existing home loan and entered into an Option ARM loan agreement with Aegis Wholesale Corporation. Compl. ¶ 3. Aegis filed a Chapter 11 bankruptcy petition on August 13, 2007, and therefore any litigation against it has been stayed. *Id.* & n. 1. Defendant GMAC Mortgage Corporation purchased the Option ARM loans from Aegis Wholesale Corporation. *Id.* ¶ 4. Defendant GMAC Mortgage, LLC serviced the Option ARM loans. *Id.* ¶ 5.

David Mills Arbogast, Jeffrey K. Berns, Arbogast and Berns LLP, Tarzana, CA, Lee A. Weiss, Rebecca Tingey, Browne Woods George LLP, New York, NY, Michael C. Eyerly, Patrick A. Deblase, Kiesel Boucher Larson, Beverly Hills, CA, for Plaintiff.

J. Matthew Goodin, P. Russell Perdew, Thomas J. Cunningham, Locke Lord Bissell and Liddell, Chicago, IL, John M. Hochhausler, Manning & Marder Kass Ellrod Ramirez, Nina Huerta, Locke Lord Bissell and Liddell LLP, Los Angeles, CA, for Defendants.

Plaintiffs' Option ARM loan ("the loan") has a variable rate feature with payment caps. *Id.* ¶ 18. Plaintiffs allege that they were promised a low fixed payment resulting from a low interest rate, but were in fact charged a much greater interest rate than promised. *Id.* Plaintiffs allege that they were told they were being sold a home loan with a low interest rate of between 1% and 3% and that the rate was fixed for the first three to five years of the loan. *Id.* ¶ 22. In fact, the loan possessed a low, fixed payment but not a low, fixed interest rate. *Id.* ¶ 25. Plaintiffs received the low interest rate for only one month; immediately thereafter, Defendants increased the interest rates they charged. *Id.*

Additionally, Plaintiffs allege that the loan documents provided to Plaintiffs promised that Plaintiffs' monthly payments would be applied to both principal and interest, but they were not. *Id.* ¶¶ 77, 180. Plaintiffs allege that Defendants failed to disclose that the monthly payment amounts they provided to Plaintiffs were insufficient to cover both principal and interest. *Id.* ¶ 182. Plaintiffs also allege that Defendants informed them that if they made payments based on the promised low interest rate, there would be no negative amortization. *Id.* ¶ 23. In fact, however, Plaintiffs experienced negative amortization. *Id.* ¶ 25.

Plaintiffs recorded a Deed of Trust in Aegis Wholesale's Favor in January 2007. Request for Judicial Notice, Ex. A. A Deed of Trust in favor of Golden Empire Mortgage, Inc. was recorded for the same property in March 2007. *Id.* Ex. B. Reconveyance of the January 2007 deed to Plaintiffs was recorded in June 2007. *Id.* Ex. C.

B. *The Loan Terms*

Plaintiffs' suit challenges the disclosures that were provided with the loan. In particular, Plaintiffs plead and argue that the disclosures related to interest rate, payment schedules, APR, and negative amortization were misleading.

The Adjustable Rate Note provided that, in return for the loan, Plaintiffs promised to pay a principal of $ 407,100. *Id.* Ex. 1, ¶ 1. The principal amount might increase as provided in the Note, but would never exceed 115% of the principal amount Plaintiffs originally borrowed. *Id.* With respect to interest rate, the Note provided, in relevant part, as follows:

(A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.950%. The interest rate I pay may change....

(B) Interest Rate Change Date

The interest rate I will pay may change on the first day of March, 2007, and on that day every month thereafter. Each date on which my interest rate could change is called an 'Interest Rate Change Date.' ... The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index....

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE and 2/10 percentage point(s) (3.200%) ('Margin') to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be

greater than 9.9500 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

*Id.* Ex. 1, ¶ 2.

The Note provided a number of terms with respect to monthly payments. The Note provided that the initial minimum monthly payments until the first Payment Change Date would be in the amount of $1,494.56 unless adjusted under Section 3(F). *Id.* Ex. 1, ¶ 3(B). The Note disclosed that this monthly payment may change as required by Section 3(D) beginning on March 1, 2012 and on that day every 12th month thereafter. Additionally, the payment would change any time Sections 3(F) or 3(G) required Plaintiffs to pay a different monthly amount. *Id.* Ex. 1, ¶ 3(C). Paragraph 3(D) explained the calculation of monthly payments. It provided that, unless 3(F) or 3(G) applied, the amount of a new monthly payment effective on a payment change date would not increase by more than 7.5% of the prior monthly payment. This limit was known as the "Payment Cap." *Id.* Ex. 1, ¶ 3(D). Unless 3(F) or 3(G) required payment of a different amount, the new minimum payment would be the lesser of (1) the amount provided by the "Payment Cap" (also known as the "Limited Payment")[1] and (2) the amount sufficient to repay the unpaid Principal that Plaintiffs are expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments, also known as the "Full Payment."[2] *Id.* Paragraph 3(G) provided that Full Payment was required as the Minimum Payment on the sixth Payment Change Date and each succeeding Payment Change Date, until the monthly payment changed again. *Id.* Ex. 1, ¶ 3(G). Paragraph 3(F) provided, in effect, that once the unpaid Principal reached the Maximum Limit (115% of the originally-borrowed Principal), Plaintiffs were required to pay the Full Payment amount as the Minimum Monthly Payment. *Id.* Ex. 1, ¶ 3(F). Additionally, after the first Interest Rate Change Date, the lender could provide Plaintiffs with up to three additional payment options greater than the Minimum Payment: an interest-only payment, a fully amortized payment, and a 15–year amortized payment.

The Note also disclosed how the unpaid Principal might increase:

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations discussed in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion, and will add the difference to my unpaid Principal[.]

*Id.* Ex. 1, ¶ 3(E). Additionally, a "Disclosure Statement" in Plaintiffs' Loan Origination File explains:

You will have the choice each month of paying the lesser of the two payments, and if the limited payment is less than the full payment, you can choose to pay more than the limited payment up to and including the full payment for your monthly payment. If you pay an amount less than the full payment that

---

1. The Limited Payment was calculated by multiplying the preceding month's Minimum Payment by 1.075. *Id.* Ex. 1, ¶ 3(D).

2. The Note Holder was obligated to calculate this amount.

would not be sufficient to cover the interest due, the difference will be added to your loan amount. This means that the balance of your loan could increase. This is known as 'negative amortization.' Aguirre Decl. Ex. 1 at 4.[3]

The loan's "Truth In Lending Disclosure Statement" ("TILDS") stated that the Annual Percentage Rate, "the cost of your credit as a yearly rate," was 8.253%. *Id.* Ex. 1 at 7. The Payment Schedule provided for 43 payments at $1,494.56 due beginning March 1, 2007; 316 payments at $3,584.47 due beginning October 1, 2010, and a final payment of $3,584.47 due on February 1, 2037.

### C. *Procedural Posture*

Plaintiffs filed this suit on August 19, 2008, on behalf of themselves and all others similarly situated. Plaintiffs allege that Defendants' actions in connection with the sale and servicing of Plaintiffs loans violated the federal Truth in Lending Act and California Business and Professions Code § 17200, as well as constituted a breach of contract, a fraudulent omission, and a tortious breach of the implied covenant of good faith and fair dealing. By their motion, Defendants seek dismissal of the entire Complaint.

## II. DISCUSSION

### A. *Legal Standard—Motion to Dismiss*

A motion to dismiss under Rule 12(b)(6) should only be granted if it is "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1132 (9th Cir.2002). When considering a 12(b)(6) motion to dismiss for failure to state a claim, "all allegations of material fact are accepted as true and should be construed in the light most

favorable to the plaintiff." *Resnick v. Hayes,* 213 F.3d 443, 447 (9th Cir.2000). A court need not accept as true conclusory allegations or allegations stating a legal conclusion. *In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1403 (9th Cir.1996). A court properly dismisses a complaint on a Rule 12(b)(6) motion based upon the "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under the cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988). The plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). That is, the plaintiffs' pleading obligation requires more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 1964–65. However, the complaint need only state "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. A well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely." *Id.* at 1964 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

### B. *Request for Judicial Notice & Consideration of Documents Outside the Complaint*

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court generally "may not consider any material beyond the pleadings." *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir.2001). Documents attached as exhibits to the Complaint, such as the Note and TILDS here, are part of the Complaint and are properly considered on a motion to dismiss. *See* Fed.R.Civ.P. 10(c)("A copy of a written instrument that is an exhibit to a pleading is part of the

---

**3.** The Court takes judicial notice of this document. *See* § II(B), *infra.*

pleading for all purposes."); *Amfac Mortg. Corp. v. Ariz. Mall of Tempe, Inc.,* 583 F.2d 426, 429–30 (9th Cir.1978).

When "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). Two exceptions exist to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion: material properly submitted as part of the complaint, even if not physically attached to it, and material subject to judicial notice under Federal Rule of Evidence 201. *Lee,* 250 F.3d at 688–89. Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered on a 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir. 2002). Similarly, the court may consider on a motion to dismiss documents whose authenticity is not contested where the plaintiff's complaint necessarily relies on them. *Lee,* 250 F.3d at 688 (quoting *Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir.1998)).

Additionally, a district court may take judicial notice of "matters of public record," *see* Fed.R.Evid. 201(b), without converting a motion to dismiss into a motion for summary judgment. *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986). A court may not, however, take judicial notice of a fact that is subject to reasonable dispute. That is, a court may take judicial notice of the undisputed matters of public record, e.g., the fact that a hearing took place, but it may not take judicial notice of disputed facts stated in public records. *Lee,* 250 F.3d at 690. For example, "[o]n a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" *Id.* (quoting *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 426–27 (3d Cir.1999)).

Defendants request judicial notice of (1) three documents recorded with the Los Angeles Recorder's Office; and (2) two documents relevant to the Complaint but not attached to it. Plaintiffs have not opposed or otherwise contested Defendants' request. Because they are matters of the public record, and because Plaintiffs do not suggest any reason to question their authenticity or the propriety of the Court's consideration of them here, the Court takes judicial notice of:

(1) attached as Exhibit A to the Request for Judicial Notice, a Deed of Trust and accompanying Riders executed by Maria and Guadalupe Velazquez, as borrowers, in favor of Aegis Wholesale Corporation, as Lender, for the real property described as "1004 Lucas Street, San Fernando, California, 91340," recorded in the Official Records of the Recorder's Office, Los Angeles County, California, on or about January 10, 2007;

(2) attached as Exhibit B to the Request for Judicial Notice, a Deed of Trust and accompanying Riders executed by Maria and Guadalupe Velazquez, as Borrowers, in favor of Golden Empire Mortgage, Inc., as Lender, for the real property described as "1004–1010 Lucas Street, San Fernando, California, 91340," recorded in the Official Records of the Recorder's Office, Los Angeles County, California, on or about May 24, 2007; and

(3) attached as Exhibit C to the Request for Judicial Notice, a Full Reconveyance executed by Executive Trustee Services, LLC, as Trustee for the Deed of Trust executed by Maria and Guadalupe Velazquez recorded on January 10, 2007, recorded in the Official Records of the Recorder's Office, Los Angeles County, California, on or about June 19, 2007.

*See Ass'n of Irritated Residents v. C & R Vanderham Dairy,* 2006 WL 2644896, \*3 n. 2 (E.D.Cal.2006) (taking judicial notice of grant deeds that have been recorded with the county).

The Court also takes judicial notice of the two disclosure statements from the Loan Origination File. Plaintiffs attached the Note and the Truth in Lending Disclosure Statement to their Complaint, and the Court therefore properly considers those documents at the Rule 12(b)(6) stage. Plaintiffs do not specifically reference the two disclosure documents in their Complaint, but they do not contest Defendants' assertion that these disclosures are essential to the alleged violations of the Truth in Lending Act, and specifically a regulation on which Plaintiffs' claims rest. *See* 12 C.F.R. § 226.19(b)(2); Compl. ¶ 71. Plaintiffs also do not contest the authenticity of these documents. Accordingly, the Court finds judicial notice of those disclosure statements proper, and grants Defendants' request. *See Lee,* 250 F.3d at 688.

### C. *Truth in Lending Act Claim (Count 1)*

#### 1. *Legal Framework*

The Truth in Lending Act ("TILA") and its enacting regulation, Regulation Z, require certain disclosures by lenders in connection with consumer loans. TILA's purpose is to "avoid the uninformed use of credit." 15 U.S.C. § 1601. Congress "sought to protect consumers' choice through full disclosure and to guard against the divergent and at times fraudulent practices stemming from uninformed use of credit." *King v. California,* 784 F.2d 910, 915 (9th Cir.1986). "TILA has been liberally construed" by the Ninth Circuit. *Jackson v. Grant,* 890 F.2d 118, 120 (9th Cir.1989). " 'To insure that the consumer is protected,' " TILA and its enacting regulation must " 'be absolutely complied with and strictly enforced,' " such that even minor violations impose liability on the lender. *Semar v. Platte Valley Federal Sav. & Loan Ass'n,* 791 F.2d 699, 704 (9th Cir.1986)(quoting *Mars v. Spartanburg Chrysler Plymouth, Inc.,* 713 F.2d 65, 67 (4th Cir.1983)).

Regulation Z, codified at 12 C.F.R. § 226.1 *et seq.,* implements TILA. Both Regulation Z and its Official Staff Commentary are binding on lenders. *See* 15 U.S.C. § 1604; *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 559–60, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). As part of Regulation Z, the Federal Reserve Board of Governors has promulgated certain model disclosure forms. A creditor who uses an appropriate model form or clause published by the Board "shall be deemed to be in compliance with the disclosure provisions" of TILA. 15 U.S.C. § 1604(b).

Three sections of Regulation Z are relevant here: 12 C.F.R. §§ 226.17, 226.18, and 226.19. Section 226.17 provides general requirements for disclosures. It requires that the disclosures be made "clearly and conspicuously in writing, in a form that the customer may keep." 12 C.F.R. § 226.17(a)(1). The disclosures "shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related." *Id.* All disclosures must reflect the "legal obligation" of the parties. 12 C.F.R. § 226.17(c)(1). Section 226.18 describes specific information that creditors must disclose to consumers in closed-end credit

transactions, including, as relevant here, the Annual Percentage Rate ("APR") and the payment schedule. 12 C.F.R. § 226.18(e), (g). Appendix H–2 to Regulation Z includes a model form for the Truth in Lending Disclosure Statement ("TILDS"). *See* Mot. Ex. 4 at 46. Section 226.19 requires that, in certain variable-rate transactions, certain disclosures "must be provided at the time an application form is provided or before the customer pays a non-refundable fee, whichever is earlier." 12 C.F.R. § 226.19(b)(2). Those disclosures include, as relevant here, information about the fact that the interest rate will be discounted and "[a]ny rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover." *Id.* § 226.19(b)(2)(v), (vii).

Plaintiffs' Complaint alleges that Defendants violated TILA (1) by failing to disclose a single composite APR; (2) because the payment schedule in the TILDS did not reflect Plaintiffs' legal obligation and is not based on the APR listed on the same document; (3) by failing to disclose that, by following the payment schedule on the TILDS, only a portion of the interest would be paid and none of the principal, thereby guaranteeing negative amortization; and (4) by failing to disclose that the loan had a discounted initial interest rate and a payment cap, each of which would cause negative amortization.

2. *Claims for Rescission and Damages*

Defendants move to dismiss Plaintiffs' TILA claims because, they argue, Plaintiffs (1) cannot rescind because they have refinanced and the deed of trust securing Defendants' loan has been reconveyed, (2)

only seek rescission on Count One, and (3) are barred by the statute of limitations from seeking damages. Plaintiffs argue that refinancing does not bar their rescission claim, that their Complaint seeks both rescission and damages, and that equitable tolling applies.

a. *Rescission*

■ If a lender fails to make the required material disclosures, TILA gives a borrower the right to rescind any credit transaction in which a security interest is created in the borrower's principal dwelling. 15 U.S.C. § 1635(a). The parties first dispute the effect of Plaintiffs' refinancing on their prayer for rescission.[4] In *King v. California,* the Ninth Circuit held that a borrower did not have a rescission claim under TILA where the loan at issue had been refinanced and the deed of trust underlying the loan had been superseded. *King,* 784 F.2d at 913 ("The loan . . . cannot be rescinded, because there is nothing to rescind."). Because the Court is bound by decisions of the Ninth Circuit, the Court holds Plaintiffs cannot state a TILA claim for rescission. *Accord Monaco v. Bear Stearns Residential Mortgage Corp.,* 554 F.Supp.2d 1034, 1038–39 (C.D.Cal. 2008).

Plaintiffs urge the Court not to follow the Ninth Circuit's decision in *King.* First, Plaintiffs frame the *King* court's discussion of refinancing and rescission as dicta. The Court disagrees with this reading of the case. Second, Plaintiffs note that the limitations on rescission were amended in 1996 and the language of § 1635(f) was "refined" through that amendment. In particular, Plaintiffs point out that "[t]he original proposed language would have destroyed the right to rescind, but instead

---

**4.** Although Plaintiffs do not plead refinancing and reconveyance, the Court took judicial notice of the reconveyance of the deed underlying Plaintiffs' loan, which was recorded with the Los Angeles County Recorder's Office in June 2007. Plaintiffs acknowledge that they have refinanced.

Congress carefully decided what actions would cut off the right to rescind." Opp. at 17. While the Court recognizes that post-decision amendments to a statute may compel a different result than that reached in an earlier decision, Plaintiffs have not explained how the new language in § 1635(f), which appears to concern the statute of limitations for an action, undermines the *King* reasoning. Third, Plaintiffs note that other circuits have disagreed with the *King* holding, and have criticized it for a "cursory" discussion. *See Handy v. Anchor Mortgage Corp.*, 464 F.3d 760, 765–66 (7th Cir.2006); *Barrett v. JP Morgan Chase Bank, N.A.*, 445 F.3d 874, 880–81 (6th Cir.2006). Whatever persuasive force the reasoning of those decisions may have, the Court is not at liberty to follow their holdings in the face of contrary binding authority. *See Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir.1987).[5]

### b. *Damages*

### i. *Complaint Seeks Damages*

Defendants argue that Count One only pleads a claim for rescission. Because the Court found that the rescission claim cannot stand in the face of refinancing, Defendants argue, Plaintiffs' entire TILA claim fails. Plaintiffs argue that the Complaint also seeks damages. In addition to rescission, TILA authorizes civil liability in the form of actual damages, statutory damages, costs, and attorneys fees. 15 U.S.C. § 1640. Although Plaintiffs specifically set out a request for rescission in Count One, on the Court's reading of the Complaint, it also seeks damages. *See* Compl. at 48; ¶¶ 123–24.

### ii. *Section 1640(e) and Equitable Tolling*

 Defendants also argue that any TILA damages claim is barred by the statute of limitations. Pursuant to § 1640(e), the statute of limitations for a

TILA damages claim is one year. The limitations period generally runs from the date of consummation of the transaction. *King*, 784 F.2d at 915. "[T]he doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *Id.* "Equitable tolling is generally applied in situations 'where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.'" *O'Donnell v. Vencor, Inc.*, 465 F.3d 1063, 1068 (9th Cir.2006)(quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). The Ninth Circuit has cautioned against resolving equitable tolling issues on a 12(b)(6) motion unless "the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980); *see Supermail Cargo, Inc. v. U.S.*, 68 F.3d 1204, 1206–07 (9th Cir.1995).

Plaintiffs' loan closed on January 4, 2007. Because Plaintiffs filed their Complaint on August 18, 2008, § 1640(e)'s one-year statute of limitations bars Plaintiffs' claims unless equitable tolling applies. Plaintiffs argue that equitable tolling applies for two reasons. First, Plaintiffs argue that equitable tolling applies because Aegis filed a Chapter 11 bankruptcy petition on August 13, 2007, thereby triggering an automatic stay. *See* 11 U.S.C. § 362. Second, Plaintiffs argue that equitable tolling applies because Plaintiffs could not reasonably have known of the existence of

---

**5.** The Court also notes that *Handy* and *Barrett,* though decided after the 1996 amendments to the statute, do not appear to distinguish *King* on that basis.

a possible claim within the limitations period.

█ Plaintiffs have not identified, and the Court has not independently found, a case holding that 11 U.S.C. § 362 tolls TILA's one-year statute of limitations as to defendants that did not file for bankruptcy. However, an automatic bankruptcy stay can trigger equitable tolling of the statute of limitations, *see O'Donnell,* 465 F.3d at 1068; *Young v. United States,* 535 U.S. 43, 50–51, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002), and, as noted above, equitable tolling applies to TILA claims, *King,* 784 F.2d at 914–15. Aegis, the initial lender, filed a Chapter 11 bankruptcy petition on August 13, 2007. Compl. ¶ 3 & n. 1. Assuming that the statute of limitations for claims against Aegis have been equitably tolled, it does not necessarily follow that claims against the Defendants in this suit, who have not filed for bankruptcy, also were tolled. There may be circumstances, however, where equitable tolling is warranted in such a situation. Defendants have pointed to a statutory provision providing Plaintiffs with the right to ask their loan servicer who the owner of the Note was, *see* 15 U.S.C. § 1641(f), and have highlighted other disclosures and timing issues that suggest Plaintiffs were not diligent in pursuing their claims. Defendants' arguments may be well-taken. However, the Court considers this issue better fit for resolution on a Motion for Summary Judgment, where a more thorough consideration of disclosures, judicially noticeable documents, and contemporaneous events is appropriate. *See Supermail Cargo,* 68 F.3d at 1206–07.

Accordingly, the Court dismisses Plaintiffs' claims for rescission under TILA but finds that this does not warrant dismissal of the entirety of Count One because Plaintiffs may be entitled to equitable tolling for their damages claim.

### 3. *Compliance with TILA*

Defendants also move to dismiss Count one on the ground that the disclosures in the Note attached to Plaintiffs' Complaint establish that Defendants complied with TILA as a matter of law.

#### a. *Disclosure of a Single, Composite APR*

The Complaint alleges that the APR disclosures in the Note violated TILA because the loan documents do not clearly and conspicuously disclose a single APR, *see* Compl. ¶¶ 59–69, and because they do not clearly and conspicuously disclose the Composite APR, *see* Compl. ¶¶ 97–109. Plaintiffs' argument on each of these allegations is essentially the same. Using the model TILDS form, the disclosure described APR as "[t]he cost of your credit as a yearly rate," and then listed APR as 8.253%. The Note, at ¶ 2(A), states: "I will pay interest at a yearly rate of 1.950%." By using "yearly rate" in both places, Plaintiffs argue, the disclosure is not clear and conspicuous and therefore violates TILA. Additionally, Plaintiffs appear to argue that the ¶ 2(A) disclosure was an improperly disclosed APR that does not reflect the composite rate.

Section 226.18 requires creditors to disclose "[t]he annual percentage rate, using that term, and a brief description such as 'the cost of your credit as a yearly rate.'" 12 C.F.R. § 226.18(e). APR, as defined by the statute, is not necessarily the same as an interest rate. As directed by 15 U.S.C. § 1606, APR is calculated in relation to the "finance charge." 15 U.S.C. § 1606. "Finance charge," meanwhile, is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). Examples of the types of charges that go into the determination of a

credit charge include interest, service charges, loan fees, fees for a credit report, and fees for insurance. *Id.*; *see Smith v. Anderson*, 801 F.2d 661, 663 (4th Cir. 1986)("APR ... differs from the general definition of interest rate because it considers, by definition, a broader range of finance charges when determining the total cost of credit as a yearly rate."). Essentially, both APR and the finance charge center on the same concept, the cost of credit. TILA requires that the cost of credit be expressed both as a dollar amount, the finance charge, and a yearly percentage rate, the APR. *See* 12 C.F.R. § 226.4(a) ("The finance charge is the cost of consumer credit as a dollar amount."); 12 C.F.R. § 226.22(a) ("The annual percentage rate is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made.").

In the case of variable rate loan with a discounted interest rate, the disclosed APR "should reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation." Staff Commentary, cmt. 17(c)(1)–10(I).[6]

If the TILDS was the only disclosure document in this case, Plaintiffs unquestionably would not make out a TILA claim regarding APR. The regulations require APR to be designated as such, to be segregated with the other required disclosures away from the Note, and to use a composite rate. The TILDS does exactly this; in fact, the TILDS uses the model form.

■ Plaintiffs' Complaint, however, rests on the effect of the additional statement in the Note, which also uses the term "yearly rate." Plaintiffs argue that this additional context makes the disclosure less than clear and conspicuous, a requirement that applies to all disclosures.

The Court disagrees, and finds the reasoning of the Fourth Circuit in *Smith* persuasive. In *Smith*, plaintiff's loan note included an APR disclosure of 19.42% in the TILDS statement, but also identified "initial interest" equal to 13.95% of the loan, due upon disbursement, and periodic interest, paid over the term of the loan at yearly rate of 14.75%. 801 F.2d at 662. Plaintiff argued that the creditor "created unnecessary confusion by stating different interest rates and principal amounts on the note and in the truth-in-lending statement." *Id.* at 663. The Fourth Circuit held that the plaintiff had not stated a claim. Because "APR" was a term of art defined in the regulations, any "perceived inconsistency ar[ose] ... from the lender's compliance with the truth-in-lending requirements." *Id.*

The same is true here. Plaintiffs point out that the disclosure in ¶ 2(A) of the note does not use the term "APR," but rather describes the payment of "interest at a yearly rate." As noted above, APR and interest rate are distinct. Plaintiffs cite to *Plascencia v. Lending 1st Mortgage*, 2008 WL 1902698 (N.D.Cal.2008), and *Pham v. T.J. Financial, Inc.*, 2008 WL 3485589 (C.D.Cal.2008), for support. Those decisions, Plaintiffs argue, hold that the plaintiff had stated a claim for failure to clearly and conspicuously disclose the APR where the APR in TILDS was different than the disclosed interest rates in the Note. The Court does not read *Plascencia* as holding as Plaintiffs suggest. Rather than discussing the failure to disclose APR, the *Plascencia* court was deciding whether the plaintiffs had stated a claim for failure to disclose the true interest rate in violation of 12 C.F.R. § 226.19(b)(2). The court

**6.** The Official Staff Commentary is at 12 C.F.R. Pt. 226, Supp. I.

referenced APR as one of the many interest rates disclosed. *See Plascencia,* 2008 WL 1902698 at *4. The Court addresses Plaintiffs' contentions about the disclosure of the proper interest rate below.

Plaintiffs do not allege that the APR disclosed in the TILDS was improperly calculated. The TILDS used the model form. Nowhere did the Note disclose a different number identified as APR than that identified on the TILDS form, or describe another number as the "cost of your credit as a yearly rate." The allegedly conflicting disclosure was identified as relating to an interest rate. Although the Note perhaps could have used "yearly interest rate" instead of "interest at a yearly rate," Plaintiffs do not raise a plausible claim. As the Fourth Circuit noted in Smith, the perceived confusion arises from the statutory disclosure requirements for APR. *See Smith,* 801 F.2d at 663. Accordingly, the Court dismisses Plaintiffs claims that Defendants failed to disclose a single, composite APR.

### b. *Disclosure of Payment Schedule*

█ Defendants also challenge Plaintiffs' allegations that the TILDS did not properly disclose the payment schedule. Plaintiffs allege that the payment schedule violates TILA in two ways. First, Plaintiffs allege that the payment schedule violates TILA because, in failing to set out the payment required to pay principal and interest in a fully amortized way, it does not reflect Plaintiffs' "legal obligation" as required by 12 C.F.R. § 226.17(c)(1). Compl. ¶¶ 91–96. Plaintiffs also allege that the payment schedule violates TILA because it fails to clearly and conspicuously disclose that the payment schedules are not based on the APR stated in the TILDS. *Id.* ¶¶ 70–82.[7] Plaintiffs also allege that the loan violated 12 C.F.R.

§ 226.17(a)(1) because the payment schedule was "presented in a way that . . . obscure[d] the relationship of the terms to each other." *Id.* ¶¶ 81–82.

Defendants' primary challenge to these allegations is that they reflect the minimum payment owed each month, which was Plaintiffs' legal obligation. Defendants argue that the payment schedule followed the requirements of the regulation and the commentary.

### i. 12 C.F.R. § 226.17(c)(1)

Section 226.18(g) requires creditors to disclose "the number, amounts, and timing of payments scheduled to repay the obligation." 12 C.F.R. § 226.18(g). The payment schedule, like all disclosures, must "reflect the terms of the legal obligation between the parties," 12 C.F.R. § 226.17(c)(1), which is "presumed to be contained in the note or contract that evidences the agreement." Staff Commentary, cmt. 17(c)(1)–2. That is, the disclosures "shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction." *Id.* 17(c)(1)–1. Where multiple rates will apply to a transaction, "the effect of the multiple rates must . . . be reflected in the calculation and disclosure of the finance charge, total of payments, and payment schedule." *Id.* 17(c)(1)–10(ii).

The Staff Commentary provides specific guidance for disclosures in discounted variable-rate transactions. One example uses a 30-year loan for $100,000 with no prepaid finance charges and rates determined by the Treasury bill rate plus 2 percent. According to the example, although the Treasury bill rate at the time of consummation is 10 percent, the creditor sets the interest rate for one year at 9 percent,

---

**7.** Some of the allegations in paragraphs 70–82 suggest a failure to disclose negative amortization, which the Court discusses in subsection II(C)(3)(c), immediately below. *See, e.g.,* Compl. ¶¶ 75–76.

instead of 12 percent according to the formula. The example loan has a 7 1/2 percent cap on payment adjustments. The Staff Commentary explains:

> The disclosure should reflect a composite annual percentage rate of 11.64 percent, based on 9 percent for one year and 12 percent for 29 years. Because of the payment cap, five levels of payments should be reflected. The payment schedule should show 12 payments of $804.62, 12 payments of $864.97, 12 payments of $929.84, 12 payments of 999.58, and 312 payments of $1,070.04.

*Id.* 17(c)(1)–10(v)(C).

The regulation and commentary confirm that the "legal obligation" required for disclosure does not necessarily require that the payment schedule be based on APR. The Commentary suggests that although both APR and the payment schedule should reflect the changing interest rates, they should do so in different ways. Additionally, example C from the Staff Commentary, quoted above, highlights a situation comparable to the loan terms here, where the terms include a cap on the increase in the minimum payment. The result is that for some years borrowers are legally obligated to make a minimum payment that may not cover the entirety of the interest and principal.

Rather, the regulation and commentary suggest that the "legal obligation" that must be reflected in the payment schedule is the monthly payment requirement contained in the Note. Although Plaintiffs were legally obligated to pay off the entire loan eventually, as relevant to a payment schedule, they were only required to pay the "Minimum Payment" each month. Compl. Ex. 1, ¶ 3. Paragraph Three provided for initial monthly payments of $1,494.56 until the first Payment Change Date, which was to occur on March 1, 2012,

unless the conditions in paragraphs 3(F) or 3(G) applied.[8] *Id.* ¶ 3(B),(C). Although paying this amount caused negative amortization after March 1, 2007, Plaintiffs were not legally obligated to pay more than this amount each month.

Plaintiffs do not suggest that the amount does not properly reflect the Minimum Payment amounts required by the Note. Because the minimum payment is the legal obligation in this Note, Plaintiffs have not stated a claim that the payment schedule violated 12 C.F.R. § 226.17(c)(1).

### ii. 12 C.F.R. § 226.17(a)(1)

█ This does not necessarily preclude Plaintiffs from stating a claim that the disclosure is not clear and conspicuous, however. Plaintiffs allege that the disclosures obscure the relationship between the different terms and suggest that a 1.950% interest rate would apply for longer. The Court primarily discusses these arguments below with respect to other allegations. The parties' briefing with respect to the payment schedule centered on the "legal obligation" language and the requirement of using APR in the payment schedule. As discussed above, the Court dismisses any claims based on that argument. As the Court reads the Complaint, however, it also alleges a violation of the "clear and conspicuous" language in § 226.17(a)(1). Because Defendants seek to dismiss the entirety of the Complaint, the Court briefly notes that the paragraphs in the Complaint that allege a § 226.17(a)(1) violation with respect to equivalence of the initial payments to a 1.950% interest rate are sufficient to survive a motion to dismiss.

### c. *Disclosure of Negative Amortization*

█ Defendants also challenge Plaintiffs' allegations that the disclosures violat-

---

**8.** As mentioned above, paragraph 3(F) provided for a different minimum payment once the principal reached a certain amount, whether this occurred before or after March 1, 2012.

ed the rules regarding negative amortization.[9] Compl. ¶¶ 83–90. Plaintiffs allege that the disclosures violated these provisions by failing to disclose in a clear and conspicuous manner that, if they were to pay their loan according to the payment schedule, negative amortization was certain to occur. Instead, Plaintiffs allege, the disclosures misleadingly framed negative amortization as a mere possibility.

Pursuant to 12 C.F.R. § 226.19(b), borrowers in certain variable-rate transactions must be provided with certain disclosures "at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier." 12 C.F.R. § 226.19(b). As relevant here, they must be provided with "[a] loan program disclosure for each variable-rate program expresses an interest," and that disclosure must include "[a]ny rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover." 12 C.F.R. § 226.19(b)(2)(vii). The Staff Commentary to this provision explains that a lender must disclose the possibility of negative amortization. In particular, "[i]f a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the effects of exercising the option (such as negative amortization will occur and the principal loan balance will increase)." Staff Commentary, cmt. 19(b)(2)(vii)–2.

In *Plascencia*, the court found that the plaintiffs had stated a claim for a violation of § 226.19(b)(2)(vii). The plaintiffs had alleged that the defendants violated the provision by failing to disclose that, if the plaintiffs followed the payment schedule listed in the TILDS, negative amortization

was certain to occur. While the disclosures set out the rules by which negative amortization might have occurred, they referred to negative amortization only a possibility. The court explained:

> While these statements are literally accurate, they refer to negative amortization as a mere possibility. Yet under any conceivable Index value, it was clear at the time the disclosures were provided that Plaintiffs' initial minimum monthly payment would not be sufficient to cover interest. Thus, negative amortization was a certainty if Plaintiffs followed the payment schedule listed in the statement.

*Plascencia*, 2008 WL 1902698 at *6. Accordingly, the court held, the plaintiffs "may be able to show that the Note's reference to negative amortization as a hypothethical event does not clearly and conspicuously disclose 'the effects of exercising the payment cap option'—i.e., that 'negative amortization *will* occur.'" *Id.*

The Court finds *Plascencia* persuasive in this case, which has similar disclosures and makes similar allegations. All disclosures framed negative amortization as a possibility. The disclosures are perhaps literally accurate: they state that paying less than the full amount is an option under the Note, they state how negative amortization would occur, and the payment schedule provided in the TILDS appears to reflect (without using the term) negative amortization. In fact, however, if the Plaintiffs were to exercise the payment cap, negative amortization was certain to occur.

The Staff Commentary provides that the disclosure must "fully disclose the rules relating to the option, including the effects of exercising the option (such as negative

---

9. Negative amortization occurs where a borrower pays an amount that would not be sufficient to cover the interest due, and the difference is added to the loan amount.

amortization will occur and the principal loan balance will increase)." Defendants emphasize that negative amortization was not guaranteed, but rather was only a possibility—Plaintiffs also had the option of making a fully payment each month. Defendants explain that the Staff Commentary requires only the language used in the disclosures because negative amortization was only a possibility. Defendants focus on the following language from the Staff Commentary:

A creditor must disclose, where applicable, the possibility of negative amortization. For example, the disclosure might state, 'If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount.'

Staff Commentary, cmt. 19(b)(2)(vii)–2. These statements must be read, of course, in the context of the entire paragraph. Taken together, the Staff Commentary appears to require that in situations where a payment cap option *will* lead to negative amortization, the disclosure must provide as much. *See id.*

Much like in *Plascencia*, while the disclosures perhaps accurately stated how negative amortization would occur, Plaintiffs may be able to show that these references did not clearly and conspicuously disclose that, by exercising the payment cap, negative amortization would definitely occur during the first few years. *See Plascencia*, 2008 WL 1902698 at *6; *see Monaco*, 554 F.Supp.2d at 1041–42 & n. 11 (discussing negative amortization in the context of a breach of contract claim because rescission was not available, but describing the negative amortization clauses

as ambiguous). Accordingly, the Court denies Defendants' Motion to Dismiss the allegations related to negative amortization.[10]

#### d. *Initial Interest Rates*

Defendants also challenge Plaintiffs' allegations regarding the effect of a payment cap and the fact that the initial interest rate is discounted. Compl. ¶¶ 100–106, 110–123. Plaintiffs argue that Defendants failed to disclose in a clear and conspicuous manner that the initial interest rate was discounted and not based on the actual interest rate, and failed to clearly and conspicuously disclose the effect of a payment cap on their loan. The Court reads Plaintiffs' arguments about the payment cap to be essentially identical to those made with respect to negative amortization. The Court therefore addresses only the initial interest rate allegations here.

Section 226.19(b)(2)(v) requires that the program disclosure disclose "[t]he fact that the interest rate will be discounted, and a statement that the consumer should ask about the amount of the interest rate discount." 12 C.F.R. § 226.19(b)(2)(v). Like all TILA disclosures, the disclosures with respect to interest rate must be made "clearly and conspicuously in writing." 12 C.F.R. § 226.17(a)(1). The Staff Commentary to this paragraph provides that:

If the initial interest rate will be a discount or a premium rate, creditors must alert the consumer to this fact. For example, if a creditor discounted a consumer's initial rate, the disclosure might state, 'Your initial interest rate is not

---

**10.** Defendants suggest that, while disclosures regarding negative amortization are only required to be placed in separate program disclosures as opposed to the Note or the TILDS, the Complaint does not allege negative amortization with respect to separate program disclosures, but rather only with respect to the Note and the TILDS. *See* Mot. at 19–20. The Court reads the Complaint differently. *See* Compl. ¶ 90 ("Defendants' statements in the Note, TILDS, and *any other disclosures they provided*, described negative amortization as only a mere possibility ...")(emphasis added).

based on the index used to make later adjustments.' ... In addition, the disclosure must suggest that consumers inquire about the amount that program is currently discounted.

Staff Commentary, cmt. 19(b)(2)(v)–1.

Plaintiffs' allegations are sufficient to state a claim that the disclosures at issue here were not clearly and conspicuously made. The program disclosure provided the following language:

> Your initial interest rate may not be based on the index described below which is used to make later adjustments; your initial rate may include a discount or premium based on market conditions at the time the loan is made. Ask us for the current interest rate discount or premium.

Aguirre Decl. Ex. 1 at 4. This language is similar to, though slightly different than that used in the Staff Commentary: while the commentary uses the language "is not based," the disclosure here used the language "may not be based." Plaintiffs may be able to show that, when taken in conjunction with the disclosure in the Note and the TILDS, this disclosure is not clear and conspicuous as required by TILA. Plaintiffs allege, for example, that the TILDS misleadingly uses an initial monthly payment that is equal to the 1.950% interest rate. Additionally, the Note states in ¶ 2 that the yearly rate of 1.950% "*may* change on the first date of March 2007," *see* Compl. Ex. 1, ¶ 2(A),(B), when in fact later paragraphs (taken together) may have suggested that it *would* change beginning on March 1, *see id.* at ¶ 2(B)-(D). Defendants urge the Court to disregard the language in the Note and on the TILDS because, they argue, disclosures about a discounted initial interest rate need only be made on the separate program disclosures. Even if Defendants are correct as to where disclosures *must* be made, the disclosures in the Note and on

the TILDS are nevertheless relevant in determining whether Plaintiffs might make out a claim that the explanation in the program disclosures were not clear and conspicuous. Plaintiffs have done so. *See Plascencia,* 2008 WL 1902698 at *5.

Accordingly, the Court denies Defendants' motion with respect to initial interest rate disclosures.

### 4. *Summary*

As discussed above, the Court grants Defendants' motion as to the TILA rescission claims, but finds that Plaintiffs may have remaining claims for damages. Further, the Court grants Defendants' motion with respect to TILA claims for APR disclosure and the disclosure of the "legal obligation" in the payment schedule. The Court will not dismiss Plaintiffs' claims that the payment schedule was not clearly and conspicuously disclosed, Plaintiffs' claims relating to negative amortization, and Plaintiffs' claims relating to the disclosure of the initial interest rate.

### D. *UCL and Fraudulent Omission Claims (Counts 2, 3, and 4)*

Defendants also move to dismiss Counts Two, Three, and Four of the Complaint. Counts Two and Four allege violations of California Business & Professions Code § 17200 ("UCL"). Section 17200 defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.Code § 17200. Count Three alleges that Defendants fraudulently omitted material facts in connection with the disclosures. Defendants seek dismissal on two grounds. First, Defendants argue that, because each of these claims is based on TILA, Plaintiffs' claims cannot succeed. Second, Defendants argue that even if the TILA claims are proper, Defendants cannot be liable because they merely bought the loan from Aegis and therefore did not make the initial disclosures, and

also did not have a duty to disclose this information.

### 1. UCL Claims

#### a. Count Two

■ Count Two of the Complaint alleges a violation of § 17200 through "unlawful" practices. "By proscribing 'any unlawful' business practice, 'section 17200 borrows violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." *Cel–Tech Commnc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) (quoting *State Farm Fire & Casualty Co. v. Superior Court,* 45 Cal.App.4th 1093, 1103, 53 Cal.Rptr.2d 229 (1996)). Count Two is based solely on violations of TILA.

As discussed above, Plaintiffs have made out a claim for violations of TILA. Their UCL claims are therefore not subject to dismissal on this ground.

#### b. Count Four

Count Four of the Complaint alleges a violation of § 17200 through the "fraudulent" or "unfair" prong. It does not appear to be based solely on TILA violations, though much of the conduct is overlapping. Defendants argue that this claim should be dismissed because Aegis, not GMAC, was responsible for the disclosures. The Court considers this argument below.

#### c. UCL Liability for GMAC

Defendants argue that, even if Plaintiffs can state a TILA claim against GMAC, the Complaint does not state a UCL claim against GMAC because (1) GMAC is not alleged to have directly committed unlawful conduct and (2) GMAC had no disclosure obligations either under TILA or generally. Plaintiffs argue that GMAC is liable as an "aider or abettor" of Aegis's unlawful conduct.

■ While California's UCL does not support claims for vicarious liability, a plaintiff can allege a claim for aider and abettor liability under § 17200. *See In re First Alliance Mortgage Co.,* 471 F.3d 977, 995–96 (9th Cir.2006); *People v. Toomey,* 157 Cal.App.3d 1, 14–15, 203 Cal.Rptr. 642 (1984) ("[I]f the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under section[ ] 17200 ... can be imposed."). To allege aiding and abetting under California law, a plaintiff must plead that the alleged aider and abettor (1) knew that the other's conduct constituted a breach of a duty and (2) gave substantial assistance or encouragement to the other so to act. *First Alliance,* 471 F.3d at 993.

■ Defendants argue that Plaintiffs' allegations are insufficient to allege both prongs. Although the Complaint does not use the phrase "aided and abetted," the Complaint alleges collective conduct in multiple paragraphs. Plaintiffs allege that Aegis and GMAC Mortgage Corp. worked together in distributing, selling, and servicing the loans, that they initiated the scheme in order to maximize the loans they sold to consumers and to maximize profits, that GMAC Mortgage Corp. had full knowledge of Aegis's wrongful acts, and actively participated as an assignee and/or buyer. *See, e.g.,* Compl. ¶¶ 4, 6–9, 12. Plaintiffs also allege that TILA violations were apparent on the face of the documents. The Court does not find the Complaint's allegations to be implausible, as Defendants suggest. The Court finds these allegations, taken in the light most favorable to the plaintiff, sufficient to survive a motion to dismiss. *See Plascencia v. Lending 1st Mortgage,* 583 F.Supp.2d 1090, 1097–98 (N.D.Cal.2008).

### 2. Count Three: Fraudulent Omission

For the same reasons as above, the Court denies Defendants' motion to dismiss Count Three.

### E. Breach of Contract

Defendants challenge Plaintiffs' breach of contract allegations on three primary grounds. First, Defendants argue that Plaintiffs have not sufficiently alleged breach of the interest rate adjustment clauses. Second, Defendants argue that Plaintiffs have not sufficiently alleged breach in the application of payments and, even if they have, cannot show damages. Third, Defendants argue that Plaintiffs have not alleged GMAC Mortgage LLC was a party to the Note and therefore cannot sustain a breach of contract claim against GMAC Mortgage LLC.[11]

 While the resolution of contractual claims on a motion to dismiss may be proper if the terms of the contract are unambiguous, *Monaco,* 554 F.Supp.2d at 1040, a motion to dismiss should not be granted where the contract "leaves doubt as to the parties' intent." *Consul Ltd. v. Solide Enters., Inc.,* 802 F.2d 1143, 1149 (9th Cir.1986); *see Westlands Water Dist. v. U.S. Dep't of Interior,* 850 F.Supp. 1388, 1408 (E.D.Cal.1994). A contract provision is ambiguous where it is capable of two or more reasonable interpretations. *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,* 5 Cal.4th 854, 867, 21 Cal. Rptr.2d 691, 855 P.2d 1263 (1993). Mutual intention of the parties at the time the contract is formed governs interpretation of the contract. That intent "is to be inferred, if possible, solely from the written provisions of the contract," and "reliance on the common understanding of language is bedrock." *Id.*; *see* Cal. Civ.Code §§ 1636, 1638, 1639. "[L]anguage in a

contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). *See also Trustees of So. Cal. IBEW v. Flores,* 519 F.3d 1045, 1047 (9th Cir.2008).

#### 1. Interest Rate Change

 Plaintiffs allege that Defendants breached the terms of the Note by increasing the interest rate after the first month.[12] Plaintiffs allege that the contract required the interest rate to remain the same for a considerably longer period.[13]

The Court finds that Plaintiffs have adequately alleged a breach of the interest rate change provisions of the contract. At the very least, *when* the interest rate would change is ambiguous. Section 2, which governs "Interest" is at issue here. The possibility and timing of interest rate changes is initially described using permissive language. Paragraph 2(A) states that the "yearly rate" of Plaintiffs' interest "will" be 1.950%, and states that this interest rate "may change." The title of ¶ 2(B), "Interest Rate Change Date," suggests that it is the paragraph most specifically determinative of when the interest rate will change. That paragraph repeatedly describes the possibility of interest rate change as of March 1, 2007 as merely that:

> The interest rate I will pay *may change* on the first day of March 2007, and on that day every month thereafter. Each

---

**11.** Defendants also argue that Plaintiffs have not sufficiently identified particular provisions of the contract which they allege Defendants breached. The Court disagrees. *See* Compl. ¶¶ 180, 182–83.

**12.** Plaintiffs do not appear to allege that the increase was improperly calculated, but rather that this change occurred too early.

**13.** In their Complaint, Plaintiffs allege that the contract required the interest rate to remain the same for three to five years. Compl. ¶ 162. In their Opposition, Plaintiffs suggest that the interest rate need remain the same for at least a year. Opp. at 30:27–28.

dates on which my interest rate *could change* is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate *may change* monthly, but the monthly payment is recalculated in accordance with Section 3.

Compl. Ex. 1, ¶ 2(B)(emphasis added). Plaintiffs argue that this permissive language does not provide clear guidance on when the interest rate will actually change and the mutual intent of the parties was that it would remain at 1.950% for a few years. Moreover, in support of the reasonableness of their interpretation, Plaintiffs point to the use of the term "yearly" in ¶ 2(A) ("I will pay a yearly rate of 1.95%") and the TILDS payment schedule. Plaintiffs also allege that they were in an inferior bargaining position, that these loans were drafted by the lender, and that other conduct supported their interpretation of the contract terms. *See* Compl. ¶¶ 176–87.

Defendants point to later paragraphs in the Note for their interpretation that the contract expressly provided that the interest rate *would* increase on March 1, 2007. In particular, Defendants point to the first sentence of ¶ 2(C) (titled "Index"), which provides: "Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index." Compl. Ex. 1 ¶ 2(C). Defendants also point to the last sentence of ¶ 2(D), which states: "Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin." Compl. Ex. 1 ¶ 2(D). Defendants explain that, as defined in ¶ 2(B), the "Interest Rate Change Date" is each date on which interest rates *could* change, which includes March 1, 2007. Because ¶¶ 2(C) & (D)

state that Plaintiffs' "interest rate will be based on an Index" and the "interest rate will never be lower than the Margin" starting with the *first* Interest Rate Change Date, Defendants explain that the contract expressly provides that Plaintiffs' interest rate would increase from 1.95% to the interest rate provided by adding 3.200% to the current "Index."

At the very least, the Court finds the language of the contract ambiguous, and therefore finds dismissal inappropriate. Plaintiffs present a reasonable interpretation of the terms. Paragraph 2(B), the paragraph titled to indicate it describes interest rate changes, states only that the interest rate "may" change on March 1, 2007. To the extent later paragraphs indicate that the interest rate *will* change, the conflicting language makes the terms ambiguous. *Accord Monaco*, 554 F.Supp.2d at 1040–41. The placement of these disclosures—in paragraphs describing the index and the calculation of future interest rates, as opposed to the paragraph specifically addressing interest rate change *dates*— make it unclear how that language should apply. For example, the "may" language in ¶ 2(B) suggests that the interest rate *may* change on March 1, 2007 but does not necessarily change; it may be unclear whether the later language dealing with the index and margin is conditioned by that "may" language. The description of the initial interest rate as a "yearly" rate and the fact that the payment schedule in the TILDS reflects a schedule that would fully pay a 1.950% interest rates reinforce Plaintiffs' interpretation.[14]

Adjustable rate loans are *about* changing interest rates—when they change and how they change are central to the contract. In such a context, conflicting lan-

---

14. It may be worth noting that, while the first description of "interest rate" uses the term "yearly rate," the other references to interest rates in the Interest section of the loan do not use the term "yearly."

guage like that here renders the contract ambiguous. For the foregoing reasons, the Court finds this inappropriate for resolution on a motion to dismiss, and denies Defendants' motion.

### 2. *Application of Payments*

■ Plaintiffs allege that Defendants breached the terms of the Note by failing to calculate payments that would sufficiently cover both interest and principal, as allegedly required by the contract. *See* Opp. at 35 & n. 10. Plaintiffs frame these allegations as a failure to apply payments to both principal and interest. Defendants argue that the terms of the Note unambiguously show that there was no such requirement.

The Court finds that Plaintiffs have not stated a claim for breach of contract on payments of interest and principal. Plaintiffs concede that the Note clearly provides the lender with the right to apply payments to interest before principal. In claiming that Defendants were obligated to apply payments to *both* interest and principal, Plaintiffs appear to argue that the Note contains a promise that each minimum payment would be sufficient to cover both principal and interest.

Unambiguously, the Note contains no such promise. In fact, it explicitly warns of the opposite. Section 3, which covers "Payments," explains:

> Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the limitations described in Section 3(D) [regarding a cap on the payment increase], my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the inter-est portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2.

Compl. Ex. 1, ¶ 3(E). Section 3(E) is titled "Additions to My Unpaid Principal." The references throughout the contract to paying "principal and interest" do not create ambiguity. Rather, they explain Plaintiffs' obligation to make payments until they paid off the principal and interest. *See id.* ¶ 3(A). This language contemplates that some minimum payments may fully cover both principal and interest, all of interest and part of principal, or part of interest. Paragraph 3(H) likewise does not create ambiguity in the Note. Rather, ¶ 3(H) describes other payment options that the lender may provide for Plaintiffs that are "**greater** than the Minimum Payment." *Id.* ¶ 3(H) (emphasis in original). By including the "fully amortized payment" option, in context the language clearly suggests that this option may be greater than the Minimum Payments.

As discussed above, Plaintiffs have stated a claim that Defendants improperly increased the interest rate on Plaintiffs' loan. To the extent Plaintiffs allege a violation of the payments clauses of the contract on this basis, the Court denies the motion to dismiss in light of its discussion above. Plaintiffs have not stated a claim, however, for breach of a provision requiring that payments be calculated as the fully amortized amount. No such provision exists in the contract. The Court need not address Defendants' damages argument with respect to the application of payments.

### 3. *Liability/Obligations of GMACM LLC*

GMAC Mortgage LLC moves to dismiss the breach of contract claims against it on

the basis that Plaintiffs have not alleged that it is a party to the Note or that Plaintiff otherwise had a contract with GMACM LLC. While GMAC Mortgage Corp. purchased the loan from Aegis, GMAC Mortgage LLC was a servicer of the Note. Compl. ¶¶ 4–5.

■ The Court finds dismissal inappropriate at this stage. Although generally a party cannot be bound to a contract to which it is not a party, in some contexts assignees may be sued for breach of contract. *See* 1 Witkin Summary of California Law (Contracts) §§ 665, 740 (10th ed. 2005).[15] The Court will not completely preclude Plaintiffs from pursuing such a theory at this stage.

### F. Tortious Breach of the Implied Covenant of Good Faith & Fair Dealing

Finally, Defendants move to dismiss Count Six, Plaintiffs' allegations that defendants tortiously breached the implied covenant of good faith and fair dealing.

■ Although "under California law, all contracts have an implied covenant of good faith and fair dealing," *In re Vylene Enters., Inc.*, 90 F.3d 1472, 1477 (9th Cir. 1996), tort recovery for breach of the covenant, like that at issue here, "is available only in limited circumstances, generally involving a special relationship between the contracting parties." *Bionghi v. Metro. Water Dist.*, 70 Cal.App.4th 1358, 1370, 83 Cal.Rptr.2d 388 (1999). While the doctrine has been applied to the relationship between insurer and insured, California courts have "reject[ed] ... [parties'] argument[s] that the tort doctrine which has been extended only to situations where there are unique fiduciary-like relationships between the parties, should encompass normal commercial banking transac-

tions." *Mitsui Mfrs. Bank v. Superior Court*, 212 Cal.App.3d 726, 729, 260 Cal. Rptr. 793 (1989). *Cf. Hunter v. Up–Right, Inc.*, 6 Cal.4th 1174, 1180–81, 26 Cal. Rptr.2d 8, 864 P.2d 88 (1993) ("[R]emedies for breach of the covenant of good faith, which is implied in every contract and aims to make effective the agreement's promises, have almost always been limited to contract damages.... An exception developed in the context of insurance contracts."). Plaintiffs have not argued that such a fiduciary-like relationship existed here, and have not pointed to any cases to the contrary. The Court is not inclined to expand the reach of California law in this manner.

■ Rather, Plaintiffs note that tort recovery for breach of contract is permissible where there is a violation of an "independent duty arising from the principles of tort law." *See Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85, 102, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995). Plaintiffs appear to argue that their allegations surrounding an independent legal duty, i.e., the allegations giving rise to the fraudulent omissions claim, are sufficient to establish a tortious breach of the implied covenant. The Court disagrees with Plaintiffs' reading of that statement in *Freeman*. The Court does not read that statement as applying to the implied covenant of good faith and fair dealing, but rather as discussing the general difference between tort recovery and contract recovery.

Accordingly, the Court dismisses Count Six. Plaintiffs have not stated a claim for tortious breach of the implied covenant of good faith and fair dealing.

---

**15.** Defendants' argument that only Plaintiffs can breach the Note is unreasonable, at least at the motion to dismiss stage. The Note sets out duties to be performed by the Note Holder. *See, e.g.*, Compl. Ex. 1, ¶ 3.

## III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Motion to Dismiss. The Court GRANTS the motion with respect to (1) the TILA rescission claims, (2) the TILA damages claims concerning APR and the disclosure of the "legal obligation" in the payment schedule, (3) claims for breach of contract alleging that the failure to set out fully amortized minimum monthly payments was a breach, and (4) the claim for tortious breach of the implied covenant of good faith and fair dealing. The Court DENIES the motion with respect to all other claims.

IT IS SO ORDERED.