[No. G043716. Fourth Dist., Div. Three. Aug. 10, 2011.]

CLARENCE E. BOSCHMA et al., Plaintiffs and Appellants, v.
HOME LOAN CENTER, INC., Defendant and Respondent.

232

COUNSEL

Arbogast & Berns, David M. Arbogast, Jeffrey K. Berns; Spiro Moss and J. Mark Moore for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Robert S. Beall, Jonathan P. Hersey, Isaiah Z. Weedn and Karin Vogel for Defendant and Respondent.

OPINION

**IKOLA, J.**—The defining feature of an option adjustable rate mortgage loan (Option ARM) with a discounted initial interest rate (i.e., a "teaser" rate) is that for a limited number of years, the borrower may (by paying the minimum amount required to avoid default on the loan) make a monthly payment that is insufficient to pay off *the interest* accruing on the loan principal. Rather than amortizing the loan with each minimum monthly payment (as occurs with a standard mortgage loan), "negative amortization" occurs—a borrower who elects to make only the scheduled payment during the initial years of the Option ARM owes more to the lender than he or she did on the date the loan was made. After an initial period of several years in which negative amortization can occur, a borrower's payment schedule then recasts to require a minimum monthly payment that amortizes the loan.

In this case, plaintiffs[1] sued defendant Home Loan Center, Inc., for (1) fraudulent omissions and (2) violations of Business and Professions Code section 17200 et seq. (section 17200). Plaintiffs, individual borrowers who entered into Option ARM's with defendant, allege defendant's loan documents failed to adequately and accurately disclose the essential terms of the loans, namely that plaintiffs *would* suffer negative amortization if they made monthly payments according to the only payment schedule provided to them prior to the closing of the loan. The court sustained defendant's demurrer to the second amended complaint without leave to amend, reasoning that the loan documentation adequately described the nature of Option ARM's. We reverse the ensuing judgment. Plaintiffs adequately alleged fraud and section 17200 causes of action.

### FACTS

In conducting our de novo review, we "must 'give[] the complaint a reasonable interpretation, and treat[] the demurrer as admitting all material

---

[1] Plaintiffs are Clarence E. Boschma, Shirley C. Boschma, and Sharon Robison, who sued defendant on behalf of themselves and others similarly situated. The current procedural posture of the case renders class action issues irrelevant. We focus our discussion on whether the Boschmas and/or Robison have alleged a viable cause of action.

facts properly pleaded.' [Citation.] Because only factual allegations are considered on demurrer, we must disregard any 'contentions, deductions or conclusions of fact or law alleged . . . .' " (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957 [70 Cal.Rptr.3d 501].)

The Boschmas refinanced their existing home loan with defendant on or about February 1, 2006, utilizing an Option ARM. Robison agreed to an Option ARM with defendant on or about November 22, 2005; the operative complaint does not specify whether her loan was a purchase money loan or a refinancing of an existing loan.

Plaintiffs attached copies of certain loan documents to the operative complaint. We will set forth the key provisions of these documents before detailing plaintiffs' allegations. (*Barnett v. Fireman's Fund Ins. Co.* (2001) 90 Cal.App.4th 500, 505 [108 Cal.Rptr.2d 657] ["we rely on and accept as true the contents of the exhibits and treat as surplusage the pleader's allegations as to the legal effect of the exhibits"].)

*The Note*

Plaintiffs executed nearly identical documents entitled "ADJUSTABLE RATE NOTE" (Note). The Note features a bold, capitalized disclaimer below its title and loan identification numbers: "**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**" Following this disclaimer, the Note indicates the date of execution (Feb. 1, 2006, for the Boschmas, and Nov. 22, 2005, for Robison), the site of execution (Irvine, Cal.), and the address of the property that secures the loan for each party. The Note then lists 11 separate terms, which we quote in relevant part below (using the Boschmas' Note, with footnotes describing any differences in the Robison Note).

"1. **BORROWER'S PROMISE TO PAY** [¶] In return for a loan that I have received, I promise to pay U.S. $250,000.00[2] (this amount is called 'principal'), plus interest, to the order of the Lender. . . . [¶] . . . The Lender or anyone who takes this Note by transfer . . . is called the 'Note Holder.' "

"2. **INTEREST** [¶] **(A) Interest Rate** [¶] Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay

---

[2] Robison promised to pay $150,000.

interest at a yearly rate of 1.250%. The interest rate I pay may change. [¶] The interest rate required by this Section 2 is the rate I will pay both before and after any default . . . . [¶] **(B) Interest Rate Change Dates** [¶] The interest rate I will pay may change on the first day of April 1, 2006,[3] and on that day every month thereafter. Each date on which my interest rate could change is called an 'Interest Rate Change Date.' The new rate of interest will become effective on each Interest Rate Change Date. [¶] **(C) Interest Rate Limit** [¶] My interest rate will never be greater than 9.950%. [¶] **(D) Index** [¶] Beginning with the first Interest Rate Change Date, my Interest Rate will be based on an Index. The 'Index' is the Twelve-Month Average . . . . of the monthly yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year . . . . [¶] **(E) Calculation of Interest Rate Changes** [¶] Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 500/1000 percentage point(s) (3.500%)[4] to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date."

"3. **PAYMENTS** [¶] **(A) Time and Place of Payments** [¶] I will pay principal and interest by making payments every month . . . beginning on April 1, 2006.[5] I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note . . . . [¶] . . . [¶] **(B) Amount of My Initial Monthly Payments** [¶] Each of my initial monthly payments will be in the amount of $833.13.[6] This amount may change. [¶] **(C) Payment Change Dates** [¶] My monthly payment may change as required by Section 3(D) below beginning on the 1st day of April, 2007,[7] and on that day every 12th month thereafter. Each of these dates is called a 'Payment Change Date.' My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. [¶] I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below."

"**(D) Calculation of Monthly Payment Changes** [¶] Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called

[3] The first day Robison's interest rate could change was January 1, 2006.

[4] Robison's risk premium ("margin") was 3.250 percent.

[5] Robison's first payment was due January 1, 2006.

[6] Robison's initial monthly payment was $499.88.

[7] Robison's initial payment change date was January 1, 2007.

the 'Full Payment.' Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date."

"(E) Additions to My Unpaid Principal [¶] My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to principal will be the rate required by Section 2 above."

"(F) Limit on My Unpaid Principal; Increased Monthly Payment [¶] My unpaid principal can never exceed a maximum amount equal to . . . ONE HUNDRED TEN AND 000/100 PERCENT (110.000%) of the principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that . . . paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month."

"(G) Required Full Payment [¶] On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date."

"5. BORROWER'S RIGHT TO PREPAY * * See attached Prepayment Note Addendum. [¶] I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a 'prepayment.' When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this Note. [¶] I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use my prepayments to reduce the amount

of principal that I owe under this Note. However, the Note Holder may apply my prepayment to the accrued and unpaid interest on the prepayment before applying my prepayment to reduce the principal amount of this Note."

The referenced prepayment addendum states in relevant part: "Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge. If within the first THREE (3) years(s) I make a Full Prepayment or Partial Prepayment(s) of more than twenty percent (20%) of the original principal amount in any twelve (12) month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount. [¶] If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled."

*Program Disclosure*

Plaintiffs also received a three-page document entitled "ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE 12-MONTH AVERAGE OF MONTHLY 1-YR CONSTANT MATURITY INDEX PAYMENT-CAPPED NON-CONVERTIBLE ARM." "This disclosure describes the features of" the loan provided to plaintiffs. The middle of the first paragraph states in all capital letters: "THIS LOAN ALLOWS FOR NEGATIVE AMORTIZATION." The document uses bullet point explanations of the mechanics of the loan (on topics such as how interest rates are determined, how the interest rate can change, and how the payment can change), as well as examples showing the effect of interest rate fluctuations on payments made by a borrower. Our review of this material suggests it is consistent with the terms described in the Note.

On the first page of the disclosure, there is a category entitled "HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED." This category includes the following five bullet points: "• Your interest Rate will be based on an Index Rate plus a Margin. Please ask us for our current Interest Rate and Margin. [¶] • Your initial Interest Rate will not be equal to an Index Rate plus a Margin. If the initial Interest Rate is below the then-current Index plus Margin (the 'fully-indexed rate'), then the initial Interest Rate will be a 'Discounted' Interest Rate. If the initial Interest Rate is above the then-current fully-indexed Interest Rate, then the initial Interest Rate will be a 'Premium' Interest Rate. Please ask us about the current Discount or Premium. [¶] • The Index Rate is based on the twelve-month average of monthly yields on actively traded United States Securities . . . .

Since movement of the Index is usually related to market conditions that cannot be predicted, it is impossible to know in advance exactly how much interest you will have to pay over the life of the loan. . . . [¶] • When your Interest Rate changes, your new Interest Rate will equal the Index Rate plus our Margin unless your lifetime Interest Rate Cap limits the amount of change in the Interest Rate. [¶] • Your initial payment will be based on the starting interest rate on the loan, the loan amount and the term of the loan. When your payment changes, your new payment will be based on the lesser of two calculations: the payment based on the Interest Rate . . . , loan balance, and remaining loan term or the previous payment amount plus or minus 7.5% of the previous payment amount."

On page 2 of the disclosure, there is a category entitled "DEFERRED INTEREST." "Deferred interest (also known as Negative Amortization) may occur in two ways: [¶] • Because the Interest Rate has the potential to increase each month but the payment changes are generally limited to once every twelve months, the monthly payment may be insufficient to pay the interest which is accruing; and/or [¶] • When normal payment changes occur every twelve months, the payment is limited to an increase of 7.500% from the previous payment amount, which may be less than the interest that is accruing. [¶] If the interest due on your loan for a month is more than the required monthly payment, the entire payment will be applied to interest and any unpaid interest will be added to the loan balance. The interest for the next month is then calculated on the new increased loan balance. [¶] 'Accelerated Amortization' may occur if the Interest Rate decreases . . . ."

"In addition to the Minimum Monthly Payment, you have two other options in making your payment. You may make a fully amortizing payment that is a payment that pays all the interest owed for the month plus principal or you may also choose to make a monthly 'interest-only' payment. The fully amortizing payment and the interest-only payment is available only if the payment amount is greater than the Minimum Monthly Payment option. An interest-only payment amount will cover the full interest costs for that month; therefore, no additional (deferred) interest will be added to your loan balance. Your principal balance will not be increased or reduced. An interest-only payment is allowed until a fully amortizing payment is required as described above."

*Federal Truth-in-lending Disclosure Statement*

The Boschmas' truth-in-lending disclosure statement (TILDS) includes the following information in a series of boxes near the top of the form: "ANNUAL PERCENTAGE RATE [¶] The cost of your credit at a yearly rate [¶] 7.189 %"; "FINANCE CHARGE [¶] The dollar amount the credit will

cost you [¶] $403,945.90"; "Amount Financed [¶] The amount of credit provided to you or on your behalf [¶] $246,805.35"; and "Total of Payments [¶] The amount you will have paid after you have made all payments as scheduled. [¶] $650,751.25." Robison's TILDS included the same boxes, with different numbers: annual percentage rate, 6.811 percent; finance charge, $225,980.88; amount financed, $145,284.38; and total payments, $371,265.26.

The TILDS also displays a payment schedule. The Boschmas' payment schedule is as follows:

| Number of Payments | Amount of Payment | When Payments Are Due |
|---|---|---|
| 1 | 833.13 | 04/01/06 |
| 11 | 833.13 | 05/01/06 |
| 12 | 895.61 | 04/01/07 |
| 12 | 962.78 | 04/01/08 |
| 5 | 1,034.99 | 04/01/09 |
| 318 | 1,922.49 | 09/01/09 |
| 1 | 1,926.24 | 03/01/36 |

Robison's payment schedule is as follows:

| Number of Payments | Amount of Payment | When Payments Are Due |
|---|---|---|
| 1 | 499.88 | 01/01/06 |
| 11 | 499.88 | 02/01/06 |
| 12 | 537.37 | 01/01/07 |
| 12 | 557.67 | 01/01/08 |
| 12 | 621.00 | 01/01/09 |
| 5 | 667.58 | 01/01/10 |
| 306 | 1,111.06 | 06/01/10 |
| 1 | 1,111.96 | 12/01/35 |

The TILDS includes two additional noteworthy features. First, a line is marked indicating "**VARIABLE RATE FEATURE.**" The TILDS explains: "Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier." Second, the TILDS marks (with an "X") a line indicating the borrower "may . . . have to pay a [prepayment] penalty" if the loan is paid off early.

*Explanation of the Payment Schedule*

The TILDS *does not explain* how the initial payments for the first 12 months of the payment schedule ($833.13 for the Boschmas, $499.88 for

Robison) or the ensuing increases in monthly payments in the TILDS payment schedule were calculated.

To explain the first 12 payments, one must look to section 3(B) of the Note, which sets the "initial monthly payments" for the borrower ($833.13 for the Boschmas, $499.88 for Robison). Although none of the documents explain how this number is derived, it can be "reverse engineered" as follows: (1) identify the principal amount from section 1 of the Note ($250,000 for the Boschmas, $150,000 for Robison); (2) select the interest rate listed in section 2(A) of the Note (1.25 percent), *not* the APR (annual percentage rate) listed in the TILDS; and (3) using a mortgage calculator, calculate the monthly payment for a 30-year fixed rate, fully amortizing mortgage based on the interest rate listed in section 2(A) of the Note and the principal listed in section 1 of the Note. For the Boschmas: $250,000 borrowed at 1.25 percent equals 360 payments of $833.13. For Robison: $150,000 borrowed at 1.25 percent equals 360 payments of $499.88.

Of course, this is not actually a fixed rate loan. As explained in section 2(B) of the Note, the Boschmas' interest rate "may change on the first day of April 1, 2006, and on that day every month thereafter."[8] Despite this conditional language, section 2(E) of the Note in reality compels an increase in interest rates from 1.25 percent because interest under the loan is defined as an index price of treasury yields *plus a more than 3 percent margin.* Unless the index of monthly treasury yields is *less than negative 2 percent* (i.e., purchasers of treasury securities are paying the federal government more than 2 percent interest to hold their money), the interest rate stated in section 2(A) of plaintiffs' Notes is *always* going to be lower than every subsequent applicable interest rate over the course of the loan.

The TILDS payment schedule reflects this reality by its steadily increasing payment amounts. Pursuant to section 3(C) of the Note, the first payment change date is April 1, 2007, for the Boschmas and January 1, 2007, for Robison. According to their respective TILDS, the Boschmas' payment increases to $895.61 as of April 1, 2007, and Robison's payment increases to $537.37 as of January 1, 2007. These increases are derived from section 3(D) of the Note, which limits a "new monthly payment . . . to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date." Thus, for the Boschmas: $833.13 + ($833.13 x .075) = $895.61. And for Robison: $499.88 + ($499.88 x .075) = $537.37. Likewise, additional payment increases each year are derived by increasing the prior payment by 7.5 percent (Boschmas: $895.61 to $962.78 to $1,034.99; Robison: $537.37 to $577.67 to $621 to $667.58). That is, until the penultimate, more drastic increases to $1,922.49 (for the Boschmas) and

---

[8] And Robison's interest rate "may change" on January 1, 2006, and every month thereafter.

$1,111.06 (for Robison). These increases presumably reflect sections 3(E), 3(F), and 3(G) of the Note, which collectively limit the amount of negative amortization that may occur and require the borrower to eventually start making a payment that will amortize the loan regardless of the 7.5 percent limitation set forth in section 3(D). Thus, it is *implicit* in plaintiffs' payment schedules that negative amortization will occur if plaintiffs were to remit only the monthly payment amounts set forth in the payment schedules.

*Allegations in the Second Amended Complaint*

The gravamen of plaintiffs' operative complaint is that defendant failed to disclose prior to plaintiffs' entering into their Option ARM's: (1) "the loans were designed to cause negative amortization to occur"; (2) "the monthly payment amounts listed in the loan documents for the first two to five years of the loans were based entirely upon a low 'teaser' interest rate (though *not* disclosed as such by Defendants) which existed for only a single month and which was substantially lower than the actual interest rate that would be charged, such that these payment amounts would never be sufficient to pay the interest due each month"; and (3) "when [plaintiffs] followed the contractual payment schedule in the loan documents, negative amortization was *certain* to occur, resulting in a significant loss of equity in borrowers' homes, and making it much more difficult for borrowers to refinance the loans [because of the prepayment penalty included in the loan for paying off the loan within the first three years of the loan]; thus, as each month passed, the homeowners would actually owe more money than they did at the outset of the loan, with less time to repay it."

Plaintiffs allege that instead of clearly describing the consequences of making the scheduled payments set forth in the TILDS, the actual disclosures in the loan documents suggest only that negative amortization *could* occur and that payments *may* change from the original schedule based on future variability in interest rates. "Borrowers were *not* provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the [TILDS]. payment schedule." "[H]ad Defendant disclosed the payment amounts sufficient to avoid negative amortization from occurring [plaintiffs] would not have entered into the loans."

Plaintiffs allege this information was material to their decision to accept Option ARM's and they would not have entered into their Option ARM's had defendant made accurate disclosures. Plaintiffs allege defendant actively concealed and suppressed material facts from plaintiffs. "Defendants purposefully and intentionally devised this Option ARM loan scheme of flatly omitting material information and, in some cases, making partial representations while omitting material facts, in order to deceive consumers into

believing that these loans would provide a low payment and corresponding interest rate for the first two to five years of the Note and that, if they made their payments according to the payment schedule provided by Defendants, this would be sufficient to pay both principal and interest." Plaintiffs allege damages consisting of loss of equity in their homes and other unspecified damages.

With regard to their section 17200 claim, plaintiffs allege defendant's practices (as described above) were unlawful, unfair, and fraudulent. Plaintiffs identify their "injury and lost money and property" as "the amount of negative amortization resulting from Defendant's scheme."

*Demurrer Sustained*

The court sustained defendant's demurrer to the second amended complaint without leave to amend and entered judgment of dismissal. At the hearing, the court explained that "the loan documents . . . show detailed, highlighted and repeated warnings regarding the interest rate changes, adequacy of payments to cover both principal and interest, and the prospect of the negative amortization." According to the court, the second amended complaint "seems to allege that negative amortization was not certain, and that it could be avoided by making payments larger than those that were mandated by the payment schedule." The court denied further leave to amend because plaintiffs did not think they could improve upon their pleading based on the court's stated rationale for its decision.

## DISCUSSION

" 'On appeal from a dismissal after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law.' " (*Batt v. City and County of San Francisco* (2007) 155 Cal.App.4th 65, 71 [65 Cal.Rptr.3d 716].)

It is important to demarcate the boundaries of this dispute. The following are *not* at issue in this case: (1) should it be legal to offer Option ARM's to typical mortgage borrowers and (2) should it be legal to utilize teaser (discounted) interest rates (here 1.25 percent for the first *month* of a 30-year loan), which bear no relation to the actual cost of credit? Our only concern in this case is whether plaintiffs stated a cause of action under state law based on defendant's allegedly misleading, incomplete, and/or inaccurate disclosures in the Option ARM documents provided to plaintiffs.

It does not appear California state courts have addressed this precise issue. But there are a plethora of federal district court opinions addressing whether

borrowers can state a claim under the federal Truth in Lending Act (TILA; 15 U.S.C. § 1601 et seq.) and related state law causes of action based on allegedly fraudulent, unlawful, and unfair Option ARM disclosures.

*TILA*

Although plaintiffs do not allege a TILA claim or specifically base their section 17200 claim on a violation of TILA,[9] we begin with a discussion of TILA because it mandates certain disclosures by lenders in the mortgage industry and therefore provides the context for the disclosures made by defendant. Furthermore, although the trial court rejected its assertion, defendant claims its compliance with TILA provides a complete defense to plaintiffs' state law claims.

▮ TILA, title 15 of the United States Code section 1601 et seq., and its accompanying regulations (Regulation Z), 12 Code of Federal Regulations part 226.1 et seq. (2011), require specific disclosures by businesses offering consumer credit (including mortgage loans). TILA's purpose is to "avoid the uninformed use of credit." (15 U.S.C. § 1601(a).) TILA grants the Board of Governors of the Federal Reserve System power to prescribe regulations and carry out the purposes of TILA. (15 U.S.C. §§ 1602(c), 1604(a).) Subject to certain exceptions, TILA does not "annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency." (15 U.S.C. § 1610(a)(1).) Thus, the existence of TILA does not necessarily preempt plaintiffs' state law claims.

Regulation Z obligates creditors providing "closed-end credit" (such as a mortgage) to "make the disclosures required by this subpart clearly and

---

[9] This may be a matter of pleading the case to avoid removal to federal court. Or it may represent a belief on the part of plaintiffs that a time-barred TILA claim cannot provide the basis for a section 17200 "unlawful" claim. (See *Jordan v. Paul Financial, LLC* (N.D.Cal. 2010) 745 F.Supp.2d 1084, 1098 (*Jordan*) ["if plaintiffs' UCL claims are predicated on a TILA violation which is time-barred, that TILA violation may not form the predicate violation for a UCL claim"].) According to representations by defendant, this case began its life in federal court and initially included TILA claims, but those claims were dismissed based both on statute of limitations grounds *and* because the TILA allegations were "disproved by the plain language of the loan documents attached to the complaint." Defendant's source for this information in the record is not, however, a court order, but instead is defendant's own trial court memorandum of points and authorities. Defendant also accuses plaintiffs of strategic chicanery with regard to the voluntary dismissal of the federal action in favor of filing in state court. But defendant does not claim there was a final judgment on the merits in federal court or that this court is bound by a particular ruling made in the federal court action. We thus focus on the only pertinent issue: Did plaintiffs adequately allege state law causes of action in their operative complaint?

conspicuously in writing, in a form that the consumer may keep." (12 C.F.R. § 226.17(a)(1) (2011).) "This standard requires that disclosures be in a reasonably understandable form. For example, while the regulation requires no mathematical progression or format, the disclosures must be presented in a way that does not obscure the relationship of the terms to each other." (12 C.F.R. § 226, Supp. I, par. 17(a)(1) (2011).)

Variable rate mortgage borrowers must be provided with "[a] loan program disclosure" that includes "[a]ny rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover." (12 C.F.R. § 226.19(b)(2)(vii).) "If the initial interest rate will be a discount or a premium rate, creditors must alert the consumer to this fact." (12 C.F.R. § 226, Supp. I, par. 19(b)(2)(v)(1) (2011).) "A creditor must disclose, where applicable, the possibility of negative amortization. For example, the disclosure might state, 'If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount.' . . . If a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of exercising the option (such as negative amortization will occur and the principal loan balance will increase) . . . ." (12 C.F.R. § 226, Supp. I, par. 19(b)(2)(vii)2 (2011).)

*Federal District Court Cases*

A string of cases (involving strikingly similar Option ARM forms/disclosures to those used in the instant case) have held that a borrower states a claim for a violation of TILA based on, among other disclosure deficiencies, the failure of the lender to clearly state that making payments pursuant to the TILDS payment schedule *will* result in negative amortization during the initial years of the loan. (E.g., *Romero v. Countrywide Bank, N.A.* (N.D.Cal. 2010) 740 F.Supp.2d 1129, 1132–1133, 1136–1141 (*Romero*); *Ralston v. Mortgage Investors Group, Inc.* (N.D.Cal., Mar. 16, 2009, No. C 08-536 JF (RS)) 2009 WL 688858, pp. *1–*2, *5–*6 (*Ralston I*); *Velazquez v. GMAC Mortgage Corp.* (C.D.Cal. 2008) 605 F.Supp.2d 1049, 1053–1056, 1064–1066 (*Velazquez*); *Pham v. T.J. Financial, Inc.* (C.D.Cal., Aug. 11, 2008, No. CV 08-275 ABC (JCx)) 2008 WL 3485589, pp. *2–*4; *Plascencia v. Lending 1st Mortgage* (N.D.Cal., Apr. 28, 2008, No. C 07-4485 CW) 2008 WL 1902698, pp. *1–*6.)

*Velazquez, supra*, 605 F.Supp.2d at page 1065, clearly and concisely states the reasoning relied upon by these courts with regard to the issue of negative amortization: "All disclosures framed negative amortization as a possibility. The disclosures are perhaps literally accurate: they state that paying less than

the full amount is an option under the Note, they state how negative amortization would occur, and the payment schedule provided in the TILDS appears to reflect (without using the term) negative amortization. In fact, however, if the Plaintiffs were to exercise the payment cap [and make monthly payments in accordance with the payment schedule included in the TILDS], negative amortization was certain to occur." *Velazquez* concluded that the plaintiffs "may be able to show" a lack of clear and conspicuous TILA disclosures pertaining to negative amortization. (605 F.Supp.2d at p. 1066.) With regard to disclosure of the use of a discounted initial interest rate (often referred to as a teaser rate) in the program disclosure, *Velazquez* observed: "Plaintiffs may be able to show that, when taken in conjunction with the disclosure in the Note and the TILDS, [the program disclosure] is not clear and conspicuous as required by TILA." (*Id.* at p. 1067.)

We find the above cited federal district court cases to be persuasive. Cases reaching contrary results are inapposite or unconvincing. (See *Taylor v. Homecomings Financial, LLC* (N.D.Fla. 2010) 738 F.Supp.2d 1257, 1267 [explicitly noting its analysis of the disclosure issue was under Fla.'s state unfair competition law]; *Wallace v. Midwest Financial & Mortgage Services, Inc.* (E.D.Ky. 2010) 728 F.Supp.2d 906, 917–918 [granting summary judgment on TILA claim and observing plaintiff "cites to no case law, specific statutes, or regulations to support his claim that the numerous loan disclosures provided to him throughout the loan process were inadequate under TILA"]; *Conder v. Home Savings of America* (C.D.Cal. 2010) 680 F.Supp.2d 1168, 1172–1174 [granting motion to dismiss TILA claim—plaintiff did not allege loan failed to disclose certainty of negative amortization by paying according to payment schedule].)

The trial court cited a single case in support of its ruling, *Chetal v. American Home Mortgage* (N.D.Cal., Aug. 24, 2009, No. C 09-02727 CRB) 2009 WL 2612312,· page *1 (*Chetal*). But the procedural posture of *Chetal* was a motion for preliminary injunction brought by the Option ARM borrower (thus, the court addressed the merits), not a motion to dismiss brought by the lender. (*Ibid.*; see also *Appling v. Wachovia Mortgage, FSB* (N.D.Cal., June 9, 2010, No. C 10-01900 JF (PVT)) 2010 WL 2354138, pp. *1, *6–*7 [denying borrower's preliminary injunction motion, while acknowledging cases holding borrower states a TILA claim based on similar allegations].)[10]

---

[10] We grant plaintiffs' request for judicial notice. Exhibit 1 of the request for judicial notice indicates that a motion to dismiss in *Chetal* was denied on September 25, 2009. We also note that the disclosures in *Chetal*, while still using conditional language with regard to negative amortization, at least described the mechanism whereby negative amortization would occur more clearly than the disclosures in the instant case. The *Chetal* "Adjustable Rate Mortgage Loan Disclosure Statement, signed by Plaintiff, states in part: [¶] 'Increase in Principal Balance (Negative Amortization): The principal balance on your loan can increase even though you are

At least at this stage of the proceedings, it would be inappropriate to dismiss an action against defendant brought under TILA. We therefore reject defendant's argument that its "strict compliance with TILA provides a safe-harbor from [plaintiffs'] claims . . . ." And we need not reach the legal question whether a lender's strict compliance with TILA provides a safe harbor against certain state law claims based on the quality of credit disclosures. (Compare *Hauk v. JP Morgan Chase Bank USA* (9th Cir. 2009) 552 F.3d 1114, 1122–1123 [suggesting compliance with TILA may provide safe harbor for lender against § 17200 claims] with *Romero, supra,* 740 F.Supp.2d at p. 1148 [TILA does not preempt state law claims that " 'supplement' " TILA because TILA is a "conflict-preemptive statute[]" rather than a "field-preemptive statute[]"].)

### State Law Claims for Fraud and Unfair Competition

As already stated, plaintiffs did not allege a TILA claim (or borrow a TILA violation as the basis for the § 17200 claim) in the current iteration of their complaint. Thus, the real issue is not whether TILA was violated but instead whether plaintiffs sufficiently alleged a state law cause of action.

Several federal district court cases that allowed TILA claims to proceed past the motion to dismiss stage simultaneously denied motions to dismiss state law fraud and unfair business practices claims based on the same underlying factual allegations. (E.g., *Ralston I, supra,* 2009 WL 688858 at pp. *7–*8; *Velazquez, supra,* 605 F.Supp.2d at pp. 1067–1068; *Amparan v. Plaza Home Mortgage, Inc.* (N.D.Cal. 2008) 678 F.Supp.2d 961, 975–977.)

More pertinently, three federal district court cases denied motions to dismiss state fraud and section 17200 claims even though the borrowers did not state valid TILA claims. (*Jordan, supra,* 745 F.Supp.2d at pp. 1095–1100 [allowing UCL (unfair competition law) claim to proceed on fraudulent and unfair prongs but not unlawful prong]; *Ralston v. Mortgage Investors Group, Inc.* (N.D.Cal., Aug. 12, 2010, No. C 08-536 JF (PVT)) 2010 WL 3211931, pp. *3–*6 (*Ralston II*); *Brooks v. ComUnity Lending, Inc.* (N.D.Cal., July 6, 2010, No. C 07-4501 JF (PVT)) 2010 WL 2680265, pp. *1–*3, *9–*13 (*Brooks*).)

Nevertheless, the trial court sustained defendant's demurrer to both causes of action because it found the loan documents disclosed the material facts of

---

making the required monthly payments. This is called 'Negative Amortization.' This can happen as described in this section. If the Initial Interest Rate, which is used to established [*sic*] the initial monthly payment, is lower than the Subsequent Interest Rate, which applies commencing on the first day of the month immediately following the month in which your loan closes, the initial monthly payment will be insufficient to pay the interest that is accruing during the Subsequent Interest Rate period.' " (*Chetal, supra,* 2009 WL 2612312 at p. *3.)

the loan, and thereby precluded as a matter of law plaintiffs' fraud and section 17200 causes of action. We turn to our de novo examination of whether the second amended complaint adequately alleges fraud and section 17200 causes of action.

*Fraud*

Actual fraud consists, among other things, of "[t]he suppression of that which is true, by one having knowledge or belief of the fact" or "[a]ny other act fitted to deceive." (Civ. Code, § 1572, subds. 3, 5; see also Civ. Code, § 1710, subd. 3 [definition of "deceit" includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact"]; *Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 292 [17 Cal.Rptr.3d 26] (*Vega*) ["active concealment or suppression of facts . . . is the equivalent of a false representation"].)

■ " '[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.' " (*Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 748 [54 Cal.Rptr.3d 527].) ■ Fraud must be pleaded with specificity rather than with " 'general and conclusory' " allegations. (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184 [132 Cal.Rptr.2d 490, 65 P.3d 1255].)

First element: Did plaintiffs adequately plead concealed or suppressed material facts? We agree with *Jordan, supra,* 745 F.Supp.2d 1084, that, with regard to the alleged fraudulent omissions at issue, the enhanced pleading burden of a fraud claim is met by the attachment of the relevant Option ARM documents: "[P]laintiffs' evidence is the mortgage instrument, which provides the specific content of the allegedly false representations related to negative amortization, as well as the date and place of the alleged fraud. While the precise identities of the employees responsible . . . are not specified in the loan instrument, defendants possess the superior knowledge of who was responsible for crafting these loan documents." (*Id.* at p. 1096.)

The closer question is whether defendant can be deemed to have concealed or suppressed material facts even though at least some of these facts *can be* distilled from the loan documents through careful analysis of the Note and

payment schedule. Defendant did not omit any mention of negative amortization. (See, e.g., *Vega, supra*, 121 Cal.App.4th at p. 292 [plaintiff states cause of action by alleging law firm " 'sanitized' " acquisition disclosure by removing mention of " 'toxic' stock"].) Instead, defendant did not clearly state in the loan documents that plaintiffs *were receiving* a discounted initial interest rate and that making the minimum payments according to the TILDS payment schedule *definitely would* result in negative amortization.

We restate some of the relevant terms from the Option ARM documents. The Note states, in relevant part: (1) Section 2(A)—"I will pay interest at a yearly rate of 1.250%. The interest rate I pay may change"; (2) Section 2(B)—"The interest rate I will pay may change on the first day of April 1, 2006, and on that day every month thereafter"; (3) Section 3(A)—"I will pay principal and interest by making payments every month"; (4) Section 3(B)—"Each of my initial monthly payments will be in the amount of $833.13. This amount may change"; (5) Section 3(C)—"My monthly payment may change . . . on the 1st day of April, 2007"; and (6) Section 3(E)—"My monthly payment could be less than the amount of the interest portion of the monthly payment . . . ." The program disclosure suggests that plaintiffs might have a discounted rate, or they might have a premium rate. The program disclosure explains that the Option ARM "ALLOWS FOR NEGATIVE AMORTIZATION." The program disclosure states: "Because the Interest Rate has the potential to increase each month but the payment changes are generally limited to once every twelve months, the monthly payment may be insufficient to pay the interest which is accruing . . . ."

■ Keeping in mind the procedural posture of this case, we conclude plaintiffs have adequately pleaded that material facts were concealed by inaccurate representations and half-truths. If plaintiffs can show defendant intentionally used its Option ARM forms to deceive borrowers, plaintiffs may be able to establish a fraud claim. Plaintiffs' actual interest rates and monthly payments sufficient to amortize the loan (or at least pay the accruing interest) were hidden in the complexity of the Option ARM contract terms. ■ " 'The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he [or she] transacts business. Laws are made to protect the trusting as well as the suspicious. [T]he rule of *caveat emptor* should not be relied upon to reward fraud and deception.' " (*Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950, 976 [31 Cal.Rptr.3d 18].)

The root of the alleged deficiencies in defendant's disclosures is defendant's use of a significantly discounted teaser rate rather than an initial rate set

near the rate that would result from the application of the variable rate formula in the Note (an index plus 3.5/3.25 percent). The teaser rate creates an artificially low (compared to the actual cost of credit) initial payment schedule and guarantees that the actual applicable interest rate (after the first month of the loan) will exceed the interest rate used to calculate the payment schedule for the initial years of the loan. If the initial interest rate were set using the Note's variable rate formula, it would actually be possible that interest rates would adjust downward (or stay the same) after the first payment and no negative amortization would occur. In other words, the disclosures' conditional language is accurate absent a significantly discounted rate. An Option ARM loan without a teaser rate would result in a higher initial interest rate, higher initial minimum payments pursuant to the payment schedule, and a much narrower gap (even if interest rates increased) between the borrower's payment "options." Of course, without a teaser rate, the surface attractiveness of Option ARM's would have been greatly diminished precisely because the stated (initial) interest rate and (initial) payment would be higher.

Second element: Did defendant have a duty to disclose the allegedly concealed material facts to plaintiffs? Defendant certainly had a legal duty under TILA to clearly and conspicuously describe the terms of the loan to plaintiffs. (*Ralston II, supra*, 2010 WL 3211931 at pp. *4–*5.) And, even ignoring TILA, defendant had a common law duty to avoid making partial, misleading representations that effectively concealed material facts. (See *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1082–1084 [60 Cal.Rptr.2d 263, 929 P.2d 582]; *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336 [60 Cal.Rptr.2d 539].)

Third element: Did defendant conceal or suppress the truth about negative amortization with the intent to defraud plaintiffs? Taking plaintiffs' factual allegations to be true, defendant intentionally omitted a clear disclosure of the nature of plaintiffs' loans because giving a clear explanation of how the loans worked would have punctured the illusion of a low payment, low interest rate loan. An alternate explanation might be that defendant (apparently like many other mortgage lenders, as evidenced by the repetition of the same disclosures in cases discussed herein) utilized a set of forms for all Option ARM's. Perhaps these forms were selected in an effort to comply with TILA requirements regardless of the particular terms of an individual loan (e.g., whether a discounted interest rate was used) rather than as a nefarious scheme to deceive consumers. But we will not weigh the likelihood of these competing narratives on demurrer.

Fourth element: Did plaintiffs plead reliance? Reliance can be proved in a fraudulent omission case by establishing that "had the omitted information been disclosed, [the plaintiff] would have been aware of it and behaved

differently." (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1093 [23 Cal.Rptr.2d 101, 858 P.2d 568].) Plaintiffs have alleged this fact; it would be improper to adjudicate the factual question of plaintiffs' actual reliance at the demurrer stage.[11] Moreover, given our analysis of the loan documents, we reject the contention that the disclosures actually given to plaintiffs preclude reasonable reliance. (*Ralston II, supra*, 2010 WL 3211931 at pp. *5–*6 [rejecting argument that plaintiff could not prove reliance because of the contents of the loan documents]; see also *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 [44 Cal.Rptr.2d 352, 900 P.2d 601] [whether reliance is reasonable is usually a question of fact].)

Fifth element: Did plaintiffs suffer damages as a result of defendant's fraud? Plaintiffs' theory of damages (lost home equity) is problematic. Every month in which plaintiffs suffered negative amortization was a month in which they enjoyed payments lower than the amount needed to amortize the loan (or even to pay off the accruing interest). In exchange for gradually declining equity, plaintiffs retained liquid cash that they otherwise would have paid to defendant (or another lender). Viewed in this manner, plaintiffs' only "injury" is the psychological revelation (whenever it occurred) that they were not receiving a free lunch from defendant: plaintiffs could have low payments or pay off their loans, but not both at the same time. But plaintiffs' allegation of lost equity in their homes is sufficient at this stage of the proceedings to overrule defendant's demurrer. We construe plaintiffs' allegations (including the allegation that the prepayment penalty precluded refinancing into a better loan) broadly to encompass an assertion that they were misled into agreeing to Option ARM's, which led to lost equity in their homes because the terms of the Option ARM's put them in a worse economic position than they would have been had they utilized a different credit product (i.e., by deciding not to refinance their previous loans or by taking out a more suitable loan).

*Section 17200*

■ California's UCL "does not proscribe specific activities, but broadly prohibits 'any unlawful, unfair or fraudulent business act or practice and

---

[11] Of course, the mere fact that borrowers took out Option ARM's does not necessarily prove they were misled by disclosures. Borrowers who understood the terms of the loan may still have agreed to the loan because it enabled them to buy now and pay later. Some borrowers may have speculated that real estate prices would continue to climb, enabling them to refinance after the initial low payment period ended. Others may have speculated that they would have more income in a few years and that they needed to buy a home before they were "priced out" of the market. And still others may have utilized Option ARM's to facilitate non-housing-related consumer spending or to finance small businesses. This highlights the difference between disclosure policy concerns (i.e., does the consumer understand the credit product) and more paternalistic policy concerns as to whether consumers should be allowed to take on the risk of an Option ARM.

unfair, deceptive, untrue or misleading advertising.' (§ 17200.) The UCL 'governs "anti-competitive business practices" as well as injuries to consumers, and has as a major purpose "the preservation of fair business competition." [Citations.] By proscribing "any unlawful" business practice, "section 17200 'borrows' violations of other laws and treats them as unlawful practices" that the unfair competition law makes independently actionable.' [Citation.] ' "Because . . . section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. 'In other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa.' " ' " (*Puentes v. Wells Fargo Home Mortgage, Inc.* (2008) 160 Cal.App.4th 638, 643–644 [72 Cal.Rptr.3d 903].)

■ " '[A] practice may be deemed unfair even if not specifically proscribed by some other law.' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143 [131 Cal.Rptr.2d 29, 63 P.3d 937].) According to some appellate courts, a business practice is "unfair" under the UCL if (1) the consumer injury is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by consumers themselves. (*Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403–1405 [48 Cal.Rptr.3d 770].) Other courts require "that the public policy which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL . . . be tethered to specific constitutional, statutory, or regulatory provisions." (*Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1260–1261 [39 Cal.Rptr.3d 634].) Still others assess whether the practice "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers . . . [weighing] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." (*Id.* at p. 1260.) And some courts, in reviewing a pleading, apply all three tests. (*Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 256–257 [106 Cal.Rptr.3d 46].)

■ "[A] fraudulent business practice is one that is likely to deceive members of the public." (*Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235, 1255 [99 Cal.Rptr.3d 768].) "A claim based upon the fraudulent business practice prong of the UCL is 'distinct from common law fraud. "A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for . . . relief" under the UCL. [Citations.] This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of

the statute's larger purpose of protecting the general public against unscrupulous business practices.' " (*Ibid.*) A fraudulent business practice " ' "may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under" ' the UCL." (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1471 [49 Cal.Rptr.3d 227].)

With regard to their section 17200 claim, plaintiffs rely heavily on the concept of fraud. Although the second amended complaint alleges "unlawful" behavior, the only statutes specifically cited are Civil Code sections 1572 (actual fraud—omissions), 1573 (constructive fraud by omission), and 1710 (deceit). Based on our analysis of plaintiffs' common law fraud claim, we conclude plaintiffs have adequately pleaded a section 17200 claim under the unlawful and fraudulent prongs.[12]

Plaintiffs' "unfair" allegations also focus on the same material omissions/misleading disclosures in the loan documents. *Jordan, supra,* 745 F.Supp.2d at page 1100, found the plaintiffs adequately pleaded that Option ARM loans with conditional disclosures with regard to negative amortization were "unfair" under the UCL: "Plaintiffs have sufficiently alleged that they did not discover the certainty of negative amortization until they were 'locked in' with a harsh prepayment penalty under the terms of the agreement. They allege that the loan documents do not clearly specify the certainty of negative amortization. . . . Additionally, the payment schedule does not clearly indicate it is based upon the teaser rate rather than the APR listed on the top of the page. Thus, plaintiffs have sufficiently alleged that an ordinary consumer relying on the plain language of the loan agreement might not have been able to avoid the injury of negative amortization because they did not understand it was certain to occur."

We agree. As noted above in our discussion of damages, it may be difficult for plaintiffs to prove they could not have avoided *any* of the harm of negative amortization—they could have simply paid more each month once they discovered their required payment was not sufficient to pay off the interest accruing on the loan. But plaintiffs may show they were unable to

---

[12] Plaintiffs' claim under the unlawful prong is, in a sense, duplicative of plaintiffs' common law fraud cause of action (unlike the "fraudulent" prong claim, which is easier to prove in the § 17200 context). But, of course, there are separate remedies for fraud and section 17200 claims. We see no reason to force plaintiffs to select between the two causes of action at this stage of the proceedings.

avoid some substantial negative amortization. And we see no countervailing value in defendant's practice of providing general, byzantine descriptions of Option ARM's, with no clear disclosures explaining that, with regard to plaintiffs' particular loans, negative amortization would certainly occur if payments were made according to the payment schedule. To the contrary, a compelling argument can be made that lenders should be discouraged from competing by offering misleading teaser rates and low scheduled initial payments (rather than competing with regard to low effective interest rates, low fees, and economically sustainable payment schedules). Finally, to the extent an "unfair" claim must be "tethered" to specific statutory or regulatory provisions, TILA and Regulation Z provide an adequate tether even though plaintiffs are not directly relying on federal law to make their claims.

■ Defendant argues plaintiffs did not adequately allege reliance under the UCL. (See *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 325–326 [93 Cal.Rptr.3d 559, 207 P.3d 20] [UCL claimant must show reliance when alleged misrepresentations are basis for claim].) For the reasons stated above in the fraud section, we disagree.

■ Defendant also claims plaintiffs did not adequately allege standing under the UCL.[13] (Bus. & Prof. Code, § 17204 [private plaintiff must have "suffered injury in fact and . . . lost money or property as a result of the unfair competition"].) At the pleading stage, a UCL plaintiff satisfies its burden of demonstrating standing by alleging an economic injury. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 323–325 [120 Cal.Rptr.3d 741, 246 P.3d 877].) For the reasons stated above in the fraud section, plaintiffs' allegations of negative amortization/lost equity represent an economic injury.

## DISPOSITION

The judgment is reversed. The trial court is directed to overrule defendant's demurrer to the second amended complaint. Plaintiffs' request for judicial notice is granted. Plaintiffs shall recover costs incurred on appeal.

Rylaarsdam, Acting P. J., and O'Leary, J., concurred.

**RYLAARSDAM, Acting P. J.,** Concurring.—I concur; plaintiffs stated facts sufficient to constitute causes of action. But I want to emphasize that, to prove they were damaged, plaintiffs must show more than the fact that, as a result of the negative amortization, their loan balances increased. This does

---

[13] This issue was not raised below nor was it considered by the trial court.

not constitute damages. For every dollar by which the loan balances increased, they were able to keep a dollar to be saved or spent as they pleased. To prove the alleged damages plaintiffs will have to present evidence that, because of the structure of the loans, they suffered actual damages beyond their loss of equity.